Joe Rodger NEWELL, Jr., Plaintiff,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.

No. 1:87–CV–2391–RHH.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 9, 1989.

Supplemental Opinion July 20, 1989.

James L. Ford, Ford & Haley, Atlanta, Ga., for plaintiff.

Ben Kingree, III, Carter & Ansley, Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, claiming that defendant wrongfully denied benefits allegedly due to him under a group contract of major medical health and accident insurance.

On December 12 and 13, 1988, this case was tried before the court. The narrow issue presented was whether Prudential acted in an arbitrary and capricious manner in denying plaintiff's claims. The court requested the parties to file post-trial briefs summarizing their arguments. In his Post–Trial Memorandum, plaintiff argues:

(1) That Prudential's procedure for determining need for hospital care violates its fiduciary obligations under ERISA as a matter of law. Plaintiff maintains that Prudential, as a fiduciary under ERISA, cannot allow its own employees to determine a plan participant's need for hospital care;

(2) That Prudential arbitrarily and capriciously violated its own procedures for determining need for hospital care;

(3) That Prudential violated ERISA by failing to provide plaintiff with notice of denial of coverage as required by 29 U.S.C. § 1133.

Based on the evidence presented at trial, as well as the parties' briefs filed subsequent to trial, the court makes the following findings of facts and conclusions of law with respect to the ERISA claims.

Along with his Post–Trial Memorandum, plaintiff also filed a Motion for Consideration of Class Certification. On February 1, 1989, plaintiff filed a motion for Leave to Amend the Complaint. For the reasons stated below, the court DENIES plaintiff's Motion for Class Certification and plaintiff's Motion for Leave to Amend the Complaint.

I. *Motion for Consideration of Class Certification and Motion for Leave to Amend the Complaint*

Following the trial of this action on December 12 and 13, 1988, plaintiff filed a Motion for Consideration of Class Certification and a Motion for Leave to Amend the Complaint.

Northern District of Georgia Civil Rule 300–2 provides:

The plaintiff shall within 90 days after the complaint is filed move for a determination under F.R.Civ.P. 23(c)(1) as to whether the suit may be maintained by

class action. The Court may extend the time upon a showing of good cause.

Not only was plaintiff's motion for class certification filed outside the 90 day period, it was filed after the completion of the trial on the merits of plaintiff's action.

Plaintiff argues that "(g)ood cause exists for certification of this issue because the only persons who will suffer if class action status is denied are those beneficiaries who have already suffered detriment by virtue of a Prudential procedure that violates its duty under the law." Plaintiff's Memorandum in Support of its Motion for Class Certification, p. 3. Plaintiff is patently wrong in its statement that defendant will suffer no prejudice if the court grants class certification at this late juncture. Prior to the filing of plaintiff's Motion for Consideration of Class Certification, defendant had no knowledge that plaintiff was considering a class action. Thus, defendant had no opportunity to conduct discovery or prepare for trial of a class action.

In *Lusted v. San Antonio Indep. School Dist.*, 741 F.2d 817 (5th Cir.1984), the court denied plaintiff's Motion for Class Certification which was filed after trial on the merits. The court noted that since there was no indication in the record that the case was tried as a class action and "that all the parties to the action knew of its class nature and acquiesced in it," the post-trial certification of a class would be highly prejudicial. *Id.* at 821, quoting *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 446 (5th Cir.1973). Similarly, in the case at hand, defendant would be significantly prejudiced were the court to allow certification of the suggested class at this late hour.

Accordingly, the court DENIES plaintiff's Motion for Consideration of Class Certification and DENIES plaintiff's Motion for Leave to Amend the Complaint.

## II. *Findings of Facts and Conclusions of Law*

With respect to plaintiff's individual ERISA claims, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.

At all relevant times, Joe Rodger Newell, Jr. was an employee of Massey Fair Ingredient Sales, Inc. ("Massey").

2.

At all relevant times, Prudential had issued its Group Policy No. GSP86888M (the "Policy") to Massey. The Policy covered Massey employees, and upon election, the dependents of Massey employees.

3.

At all relevant times, Joe Rodger Newell, III was an insured dependent of his father under the Policy.

4.

The Policy states that "eligible charges" do not include charges for "unnecessary services or supplies." To be considered "needed," a service must meet the following tests:

(a) It is ordered by a Doctor.

(b) It is commonly and customarily recognized through-out the Doctor's profession as appropriate in the treatment of the Sickness or injury.

(c) It is neither educational nor experimental in nature.

(d) It is not furnished mainly for the purpose of medical or other research. Also, in the case of a Hospital stay, the length of the stay and Hospital services and supplies will be considered needed only to the extent Prudential determines them to be:

(a) related to the treatment of the Sickness or Injury; and

(b) not allocable to the scholastic education or vocational training of the patient.

Plaintiff's Ex. 1, p. 6.

5.

The Policy also carries a Pre–Admission and Concurrent Review Service ("PACRS") rider. The rider provides that the general

policy includes the tests for determination of need. However, pursuant to the rider, claimants must request that Prudential make a "determination of need." A determination of need is "a determination by Prudential, under the terms of the Coverage, that approves or disapproves a day or days of Inpatient Hospital Stay ... as needed for medical care of a diagnosed Sickness or Injury." Id., p. 45. The determination of need is to be made prior to admission. If Prudential finds "medical necessity" for admission, it will inform the doctor and the hospital, by phone, of the number of days of inpatient hospital stay that Prudential approves. The Policy provides that written notice will be sent to the claimant, the doctor and the hospital, indicating the number or pre-authorized days.

The Policy also provides that it may be possible to extend the number of days of inpatient hospital stay that Prudential approves as needed for the medical care of the patient's condition; upon request being made, Prudential will make a new determination of need upon information received by the doctor.

### 6.

On December 2, 1986, after approximately two months of out patient care, Joe Newell, III was admitted to the Greenleaf Center Inc. ("Greenleaf") under the care of his attending physician, G. Michael Schmits, M.D. At the time of his admission to Greenleaf, Mr. Newell was sixteen years old and was a high school student in his junior year.

### 7.

Greenleaf is a JCAH accredited hospital located in Fort Oglethorpe, Georgia. It provides for outpatient and inpatient health care for individuals who have been diagnosed with psychiatric or substance abuse conditions. Greenleaf provides an adolescent health care unit which has facilities for approximately twenty patients. According to Dr. Schmits, these patients are not segregated on a diagnostic basis because of the substantial overlap between psychiatric and substance abuse problems in adolescents. Greenleaf provides a controlled hospital environment for adolescents suffering from alcohol abuse and substance abuse; Greenleaf offers educational and detoxification programs.

### 8.

Dr. Schmits, who conducted the initial psychiatric evaluation on Joe Newell, III at the time of his admission, listed dual diagnoses of major depression and recurrent substance abuse. Neither of these diagnoses was intended as a primary diagnosis; rather, Dr. Schmits felt the two diagnoses were inextricably interwoven.

### 9.

Upon Joe Newell, III's admission to Greenleaf, Cindy Sedman, the Admissions and Discharge Coordinator of Greenleaf contacted Prudential to inquire about coverage under the Policy. At that time, Ms. Sedman spoke with Ms. Deaton at Prudential. Ms. Sedman learned that Joe Newell, III had insurance coverage but that a determination of need for inpatient hospital stay was required (pursuant to the PACRS provision).

### 10.

After speaking with Ms. Deaton, Ms. Sedman was under the impression that the Policy had a 60 day, $20,000 limit for both alcohol and substance abuse. The Policy actually had unlimited benefits for alcohol or substance abuse but had a 30 day and $20,000 limit on benefits for depression. On January 13, 1987, Ms. Sedman spoke with Prudential agent Lori Daniels. Following this conversation, Ms. Sedman was under the impression that the Policy provided unlimited benefits for both alcohol/substance abuse and depression.

### 11.

On December 4, 1986, Prudential's PACRS, in Parsippany, New Jersey, sent a form letter to Dr. Schmits which confirmed that it had been notified of Joe Newell, III's admission to Greenleaf. The letter also requested that a copy of the admission

note and an estimated length of stay be sent to PACRS in five working days of that letter so that PACRS could make a determination of need. These documents were sent to PACRS.

12.

On December 9, 1986, PACRS advised Ms. Sedman that a seven day hospital stay had been approved for Joe Newell, III.

13.

On December 17, 1986, PACRS recorded in an internal memorandum that Joe Newell, III was certified for an additional 21 days of inpatient stay. PACRS' records also indicated that, based on the 30 day limit for psychiatric diagnoses such as depression, no more days would be certified for inpatient stay. PACRS' internal records also indicate that Cindy Sedman at Greenleaf was orally notified of a 30 day limit on benefits pursuant to a psychiatric (i.e., depression) diagnosis. There is no evidence that either Greenleaf or the Newells received written notice at this time of any limit on benefits.

14.

On December 22, 1986, Ellen Darner of PACRS called Ms. Sedman and requested records of Joe Newell, III. Ms. Sedman then mailed Joe Newells' entire chart to PACRS. This chart included a second psychiatric evaluation of Joe Newell, III, prepared by Dr. Schmits on December 17, 1986. The evaluation again listed dual diagnoses of alcohol/substance abuse and depression. PACRS treated this second evaluation, which listed alcohol/substance abuse before depression, as evidence of a change in the primary diagnosis from depression to alcohol/substance abuse. However, Dr. Schmits testimony revealed that neither of the two diagnoses was predominant.

15.

On December 24, 1986, PACRS' internal records reflect that, based on the purported change in diagnosis, 42 days would be pre-certified. PACRS' internal records again

indicate that Greenleaf's Cindy Sedman was notified orally of this extension on December 29, 1986. The extension provided Joe Newell, III with coverage for inpatient care through January 13, 1987. PACRS' internal memorandum indicates that after January 13, 1987, the patient would be placed on "retro review." Again, there is no evidence that a written notice was issued advising the Newells of the extension of coverage through January 13, 1987 or that the case would be on retro review status following January 13, 1987.

16.

On December 29, 1986, Mr. Newell, Jr. contacted Gloria Buxton in Prudential's regional claims office in Jacksonville, Florida to ascertain what the coverage would be for Joe Newell III's stay in Greenleaf. Ms. Buxton agreed to look into the case.

17.

On January 13, 1987, Greenleaf's Cindy Sedman was notified by Lori Daniel of Prudential that benefits for alcohol and substance abuse were unlimited, subject to Prudential's certification of need program. Greenleaf was advised that coverage for Joe Newell, III was approved for 42 days, through January 13, 1987.

18.

On March 5, 1987, PACRS conducted a full review of the records to determine whether medical necessity for hospitalization of Joe Newell, III past January 25, 1987 could be substantiated. Based on a review of the medical records, Dr. Goldart concluded that no medical necessity for benefits past January 25, 1987 could be substantiated.

19.

On March 9, 1987, PACRS sent a letter to Mr. Newell, Jr., informing him of PACRS' decision to deny benefits subsequent to January 25, 1987. The letter informed Mr. Newell, Jr. that PACRS had found that no medical necessity for inpatient treatment past January 25, 1987 could

be substantiated. The letter further indicated that Mr. Newell, Jr. could forward to PACRS additional information for review.

### 20.

On May 13, 1987, Prudential agent Gloria Buxton sent Mr. Newell, Jr. a letter which restated the information contained in PACRS' letter of March 9, 1987.

### 21.

On June 1, 1987, plaintiff's counsel wrote to Prudential requesting immediate payment of benefits for Joe Newell, III's treatment after January 25, 1987.

### 22.

On July 7, 1987, Dr. Goldart requested an independent psychiatric review of Joe Newell, III's records. Two psychiatrists with the American Psychiatric Association's Peer Review System reviewed Joe Newell, III's hospital records and determined that there was no medical necessity for inpatient treatment subsequent to January 25, 1987.

## CONCLUSIONS OF LAW

### 1.

The Employee Retirement Income Security Act ("ERISA") applies to all employee welfare benefit plans established by an employer engaged in interstate commerce or in any industry affecting interstate commerce. The group insurance contract, GSP86888M issued to Massey by Prudential falls within the ERISA definition of an employee welfare benefit plan, 29 U.S.C. § 1002(1).

### 2.

Plaintiff's action constitutes a claim under the civil enforcement provisions of ERISA. 29 U.S.C. § 1001, *et seq.* The civil enforcement mechanism provided by the act, 29 U.S.C. § 1132, provides the exclusive remedies for beneficiaries of a 29 U.S.C. § 1003(a) benefit plan who believe such plan is not being administered in accordance with its terms or with the provisions of ERISA. *Pilot Life Ins. Co. v.*

*Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), *Belasco v. W.K.P. Wilson & Sons, Inc.,* 833 F.2d 277 (11th Cir.1987).

### 3.

Under ERISA, the term "fiduciary" includes people who exercise discretionary authority or control over the management or administration of an employee benefit plan or over the assets. 29 U.S.C. § 1002(21)(A). A person is a fiduciary with respect to a plan to the extent (1) he exercises any discretionary control respecting management or disposition of its assets, ... or, he has any discretionary responsibility in the administration of such plan. *Id.* The term "person" as used in ERISA can mean an individual or a corporation. 29 U.S.C. § 1002(9), 29 C.F.R. § 2509.75–5, FR–3. Prudential falls within ERISA's definition of a fiduciary.

### 4.

In discharging its duties, a fiduciary must act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan...." 29 U.S.C. § 1104(a)(1)(A).

### 5.

Despite the restrictive language of 29 U.S.C. § 1104(a)(1)(A), that a fiduciary act solely in the interest of the participants and beneficiaries, 29 U.S.C. § 1108(c)(3) specifically allows a fiduciary to serve as an officer, employee, agent or other representative of an employer.

### 6.

Plaintiff argues that Prudential's procedure for determining need for hospital care is violative of ERISA as a matter of law since a Prudential employee is charged with the responsibility of rendering the determination of medical need. However, an individual may act as both an ERISA fiduciary and also as an administrator of an

employee welfare benefit plan. *Evans v. Bexley,* 750 F.2d 1498, 1499 (11th Cir.1985). Thus, Prudential's practice of having an employee render decisions as to necessity for hospital care does not violate ERISA as a matter of law. *See Local Union 2134, U.M.W. of America v. Powhatan Fuel, Inc.,* 828 F.2d 710, 713 (11th Cir.1987).

### 7.

The standard to which ERISA holds fiduciaries in the exercise of their duties is the "prudence" rule. The rule requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances" that a prudent person would use. 29 U.S.C. § 1104(a)(1)(B).

### 8.

The actions of a fiduciary in administering an employee welfare benefit plan governed by ERISA are to be reviewed by the court under an arbitrary and capricious standard. *Dennard v. The Richards Group, Inc.,* 681 F.2d 306 (5th Cir.1982), *Anderson v. Ciba–Geigy Corp.,* 759 F.2d 1518 (11th Cir.1985). The court can overturn the decision to deny benefits only if the decision is arbitrary and capricious.

### 9.

■ Dr. Goldart's determination that Joe Newell, III's hospital stay after January 25, 1987 was not medically necessary was not arbitrary and capricious. Dr. Goldart made this determination after reviewing hospital records that indicated that the patient was responding well to treatment, was eating and sleeping well, was participating in group activities and had accepted his alcohol dependency. Dr. Goldart's determination to deny benefits after 54 days of inpatient care was also based in part on the fact that 42 days is the protocol or average length of stay for an adolescent inpatient confinement. Thus, Dr. Goldart determined that medical need was not substantiated since more than 42 days on inpatient treatment for adolescent alcohol/drug dependency is not "commonly and customarily recognized throughout the Doctor's profession as appropriate in ... treat-

ment...." Additionally, Dr. Goldart could not substantiate that the inpatient treatment was necessarily "related to the treatment of the Sickness or Injury." *See* Plaintiff's Ex. 1, p. 6. Dr. Goldart's determination was subsequently supported by the findings of the independent American Psychiatric Association's Peer Review System. This court cannot say that Dr. Goldart's decision to terminate benefits after January 25, 1987 was irrational or made in bad faith.

### 10.

■ Prudential and/or PACRS did not meet their self-imposed standard for affording oral and written notice to the hospital, doctor and patient concerning the number of days that had been pre-certified. PACRS did notify the Newells and Greenleaf of the pre-authorization for Joe Newell, III's initial 7 days of hospitalization. However, subsequent written or oral notifications of additional days of certification were not forthcoming. Only on March 9, 1987 did PACRS finally meet its standard of affording proper written notification. While the court cannot approve PACRS' and/or Prudential's poor notification procedures, the court cannot find such conduct was arbitrary or capricious.

### 11.

■ 29 U.S.C. § 1133 provides that any participant in an employee welfare benefit plan whose claim for benefits is denied must receive a written notice setting forth the specific reasons for such denial. In addition, the participant must be afforded a reasonable opportunity for full and fair review by the appropriate named fiduciary of the decision denying the claim. Notice of denial must be sent to the participant within 90 days of the claim. 29 C.F.R. 2560.503–1(e)(3). The notice must give specific reasons for the denial and must refer to plan provisions on which the denial is based. Also, the notice should include appropriate information as to the steps to be taken if the participant wishes to submit his or her claim for review. 29 C.F.R. § 2560.503–1(f).

### 12.

PACRS' letter to Mr. Joe R. Newell, dated March 9, 1987 satisfied ERISA's requirements of "reasonable" notice. The notice was received by Mr. Newell within 90 days of the claim for extension of benefits; the notice indicated that denial was based on lack of medical necessity; finally, the notice advised Mr. Newell that additional information for review could be submitted to the PACRS offices.

### 13.

As a subsidiary of insurance company administering Massey's employee welfare benefit plan, PACRS was the "named fiduciary" for purposes of reviewing claims. 29 C.F.R. § 2560.503–1(i)(2). PACRS' Dr. Jed Goldart first conducted a review of all the medical records on March 5, 1987. Then, PACRS contacted an the Peer Review Group of the American Psychiatric Association. Two independent psychiatrists affirmed Dr. Goldart's decision. Thus, plaintiff was afforded adequate review of his claim pursuant to 29 U.S.C. § 1133, not only by the named fiduciary, but also by an independent group.

### 14.

In summary, the court finds:

(A) Prudential did not violate ERISA as a matter of law by allowing a Prudential employee to make decisions concerning medical necessity of inpatient care;

(B) Prudential did not arbitrarily and capriciously deny plaintiff's claims for benefits after January 1, 1987;

(C) Prudential provided sufficient notice to plaintiff of the denial of his claims.

So ORDERED.

### SUPPLEMENTAL OPINION

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., claiming that defendant wrongfully denied him benefits allegedly due under a group contract of major medical health and accident insurance.

The case was tried before this court on December 12 and 13, 1988. After carefully considering the parties' oral presentations as well as their post-trial memoranda, the court entered its Findings of Fact and Conclusions of Law on February 8, 1989. The court determined that (1) Prudential did not violate ERISA as a matter of law by allowing a Prudential employee to make decisions concerning the medical necessity of inpatient care; (2) Prudential did not arbitrarily and capriciously deny plaintiff's claim for benefits and (3) Prudential provided ample notice to plaintiff of the denial of his claims.

Shortly after this court rendered its decision, the Supreme Court issued its opinion in *Firestone Tire & Rubber Co. v. Bruch*, ── U.S. ──, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In line with several other courts, this court concluded that *Firestone* applied retroactively to its February 8, 1989 decision.[1] Accordingly, this court requested that the parties submit briefs addressing the impact that the change in the applicable standard of review mandated by *Firestone* would have on this action.

The court now determines that *Firestone* does not affect this court's decision of February 8, 1989, reached under the arbitrary and capricious standard of review. The court discusses the reasons for this conclusion below. In addition, the court considers below plaintiff's Motion to Amend to Include Additional Findings of Fact and For Judgment and Plaintiff's Motion For Review of Defendant's Bill of Costs.

### DISCUSSION

#### I. *Standard of Review*

The Supreme Court has recently clarified the standard for judicial review of ERISA fiduciaries' decisions which are challenged pursuant to 29 U.S.C. § 1132(a)(1)(B).[2] In

---

1. *See, e.g., Lowry v. Bankers Life and Casualty Retirement Plan*, 871 F.2d 522 (5th Cir.1989); *Burnham v. Guardian Life Insurance Company of America*, 873 F.2d 486 (1st Cir.1989).

2. 29 U.S.C. § 1132(a)(1) provides that a "civil action may be brought ... by a participant or beneficiary [of a covered plan] ... (A) for the relief provided for in [§ 1132(c) ], [and] (B) to

*Firestone*, 109 S.Ct. at 956, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the plan does impart the administrator with such discretionary authority, application of the more deferential "arbitrary and capricious" standard is still appropriate.[3] *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37 (11th Cir.1989).

■ This court must therefore inquire whether the employee welfare benefit plan administered by Prudential affords the administrator discretionary power which transports the standard of judicial review out of the *de novo* category and into the more deferential arbitrary and capricious mode. However, before addressing the appropriate standard of review, the court will consider defendant's contention that *Firestone* has no relevance to this action.

Defendant asserts that *Firestone* only requires *de novo* review in actions challenging denials based on plan interpretations. In cases in which the plan administrator makes factual findings involving a claim by an ERISA plan beneficiary, defendant claims *Firestone* has no relevance. This distinction is not supported by the language of *Firestone*, which states that the *de novo* standard is appropriate for review of administrator's decisions relating to both determinations of eligibility for benefits *and* to construction of plan terms. *Firestone*, 109 S.Ct. at 956. Determinations of eligibility requirements will almost always involve factual findings by the administrator. Prudential's attempt at segre-

gating administrative decisions into strict categories of factual findings or legal conclusions is unnecessarily formalistic.[4] Furthermore, such a narrow reading of *Firestone* misses the core of that decision, which reaffirms the liberal tenor of ERISA. *See, e.g., Brown v. Ampco–Pittsburgh Corp.*, 876 F.2d 546 (6th Cir., 1989).

■ Having determined that *Firestone* is applicable to the case at hand, this court must determine whether Prudential's employee welfare benefit plan, as a matter of law, granted the plan administrators discretionary authority.

The only portion of the employee welfare benefit plan which arguably grants any discretionary authority to the plan administrators reads as follows:

Generally Excluded Charges:

Also in the case of a hospital stay, the length of the stay and Hospital services and supplies will be considered "needed" only to the extent Prudential determines them to be (a) related to the treatment of the sickness or injury and (b) not allocable to the scholastic education or vocational training of the patient.

Plaintiff's Ex. 1, p. 6.

This policy provision clearly affords Prudential some discretion in determining whether a hospital stay is related to treatment. *Firestone* itself held that the *de novo* standard applies when there is "no evidence" that the plan administrator has discretionary authority to determine eligibility. *Firestone*, 109 S.Ct. at 954. Thus, any evidence of a grant of discretionary authority would change the standard of

recover benefits due to him under the terms of his plan."

**3.** When this case first came before this court, most courts, including those in the Eleventh Circuit, reviewed ERISA claims decisions under an arbitrary and capricious test. *See generally* Comment, The Arbitrary and Capricious Standard Under ERISA: Its Origins and Applications, 23 Duquesne L.Rev. 1033 (1985).

**4.** This is not to say, however, that the court is assuming that *Firestone* allows a reviewing court to resolve questions of fact in deciding the appropriate standard of review. Today, we

reach our result as a matter of law because the language of the employee welfare benefit plan is not ambiguous in its grant of discretionary authority. As the court noted in *Lowry v. Bankers Life and Casualty Retirement Plan*, 871 F.2d 522, 525 n. 5 (5th Cir.1989), "[i]n the future, of course, the district courts will determine in the first instance the appropriate standard of review under § 1132(a)(1)(B) in cases involving particular plan instruments. Definitive construction of plan language in some cases may involve questions of fact."

review from *de novo* to arbitrary and capricious.

Certainly, most cases since *Firestone* reveal that courts are willing to find any minimal delegation of discretion ample to trigger the arbitrary and capricious standard of review. For example, in *Lakey v. Remington Arms Co.*, 874 F.2d 541 (8th Cir.1989), the court found that the policy at issue gave the defendant-administrator sufficient power to construe uncertain terms such that the arbitrary and capricious standard was appropriate:

> A thorough examination of the plan convinces us that RAC had such discretionary power. On page three of the RAC severance pay policy document, RAC "attempts to interpret the more usual situations that may arise in the application of the principle of the [severance pay] policy."

*Id.* at 544.

According to the Eighth Circuit, the fact that a plan indicates that an administrator "attempts to interpret" is ample justification to utilize the arbitrary and capricious standard of review. Similarly, in *Lowry*, 871 F.2d at 522, the Fifth Circuit applied the arbitrary and capricious test where the plan granted "permissive authority ... to 'interpret and construe' the Savings Plan and the power 'to determine all questions of eligibility and status under the plan.'" *See also Boyd v. Trustees of United Mine Workers Health and Retirement Funds*, 873 F.2d 57 (4th Cir.1989) (where the court determined that the abuse of discretion standard applied when pension fund trustees had explicit discretionary authority to determine eligibility for benefits and to promulgate regulations to implement the pension plan); *Reeser v. Esmark, Inc.*, 714 F.Supp. 412 (S.D.Iowa 1989) (where the court applied the arbitrary and capricious test because the plan provided the administrator with "discretion to determine a participant's eligibility for disability benefits and to construe the plan terms.").

The most recent Eleventh Circuit case on point states that *Firestone* mandates an "express" delegation of discretionary authority to the administrator before the courts should fall back on the arbitrary and capricious standard of review. *Guy v. Southeastern Iron Workers' Welfare Fund*, 877 F.2d 37 (11th Cir.1989). The court found such a delegation in the plan provisions conferring the trustees with "full and exclusive authority to determine all questions of cover and eligibility."[5]

All of these cases indicate that, despite the Supreme Court's broad statement of a policy favoring *de novo* standard of review, in most circumstances an ERISA plan will contain language granting the plan administrator discretionary authority such that the arbitrary and capricious standard is still applicable.

The language in the Prudential employee welfare benefit plan delegates to Prudential's employees (the plan administrators) the authority to make determinations as to whether a given treatment is related to the beneficiary's illness, and therefore whether the treatment is "medically needed." In line with *Firestone* and its progeny, this court finds that plan provision in the case at hand expressly grants Prudential discretionary authority in making benefit determinations. Thus, absent a finding of arbitrariness or caprice on the part of the plan administrator, the court should defer to the administrator's decisions.

## II. *Conflict of Interest*

After determining that the arbitrary and capricious standard of review applies, this court must still measure the impact any potential conflict of interest might have on the administrator's decisions. *Firestone* instructs that:

> ... if a benefit plan gives discretion to an administrator or a fiduciary who is operating under a conflict of interest, that conflict must be weighed as a

**5.** The Eleventh Circuit in *Guy* seems to require a more explicit delegation of discretionary authority than that required by other Circuits and by the Supreme Court in *Firestone*. Since the Policy in the case at hand expressly grants authority to the plan administrators, we find that review under the arbitrary and capricious standard would satisfy the Eleventh Circuit's test.

"factor[ ] in determining whether there is an abuse of discretion."

*Firestone*, 109 S.Ct. at 956–57, quoting Restatement (Second) of Trusts § 187, Comment d (1959).[6]

Plaintiff reasserts in its Brief on the Applicable Standard of Review that Prudential operated under a conflict of interest by having its employee, Dr. Jed Goldart, render claims decisions. The court rejected plaintiff's conflict of interest argument in the Conclusions of Law entered February 8, 1989. The court determined that "Prudential's practice of having an employee render decisions as to necessity for hospital care does not violate ERISA as a matter of law." Order, p. 13. The court now reaffirms its findings that Prudential was not operating under a conflict of interest. Thus, the court's review of Prudential's claim denial under an arbitrary and capricious test need not be tempered since no conflict of interest has been demonstrated.

To summarize, the court stands by its decision of February 8, 1989. Although *Firestone* changed the standard of review for § 1132(a)(1)(B) claims to *de novo* review, in the case at hand the arbitrary and capricious standard was properly employed because the plan delegated discretionary authority to its administrators.

### III. *Motion to Amend to Include Additional Findings of Fact*

Pursuant to Fed.R.Civ.P. 52(b), plaintiff has filed a motion to amend this court's Findings of Facts. The court PARTIALLY GRANTS this motion.

Plaintiff first requests an additional finding that

1. The PACRS rider in the Policy expressly states that it applies the test found elsewhere in the Policy for de-

termining whether or not medical care is deemed to be necessary. Those tests are found in the Policy provision entitled "Generally Excluded Charges".

In the court's February 8, 1989 order, it explicitly held that the PACRS rider refers to the general policy to determine need. The court did not, however, indicate that the test found in the Policy provision is entitled "Generally Excluded Charges." The court will therefore amend the Findings of Fact to state that the test for determination of need is found in the "Generally Excluded Charges" provision of the Policy.

The court DENIES plaintiff's two additional requests for amendments to the Findings of Fact. The testimony of Dr. Jed Goldart at trial refutes plaintiff's claims that Dr. Goldart did not follow Prudential's test for determining need for Joe Newell III's hospital stay. On page 248 of the Trial Transcript, Dr. Jed Goldart testified that the charges for Joe Newell III's hospital stay after January 25 were not appropriate for the treatment of his sickness, and therefore were not medically necessary. These conclusions were made in accordance with the Policy provision relating to determinations of need for hospital stay. See Plaintiff's Exhibit 1, p. 6, (CR 011C)–1.

### IV. *Plaintiff's Motion for Review of Defendant's Bill of Costs*

On March 9, 1989, defendant filed its Bill of Costs seeking a total of $1,678.18. Thereafter, plaintiff filed a Motion for Review of Defendant's Bill of Costs but requested that the court defer ruling on such motion until the court had rendered its final opinion in light of *Firestone*. The court DEFERS ruling on Plaintiff's Motion

---

**6.** The arbitrary and capricious standard of review has been interpreted as a "range" rather that a "point":

"There may be in effect a siding scale of judicial review of trustee's decisions …— more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.... The existence of a sliding scale in judicial review of trustees' decisions is suggested by the cases that, while purporting

to apply a uniform 'arbitrary and capricious' standard, in fact give less deference to a decision the more the trustees' impartiality can fairly be questioned."

*Van Boxel v. Journal Company Employees' Pension Trust*, 836 F.2d 1048, 1052–53 (7th Cir.1987) (Posner, J.) (citing, *inter alia*, Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 764, 784 (1982).

**1244**

for Review of Defendant's Bill of Costs until plaintiff has had an opportunity to supplement his memorandum in light of this court's final ruling. The plaintiff shall have twenty days from the date of this order in which to supplement his response to defendant's Bill of Costs.

### CONCLUSION

The court reaffirms its order of February 8, 1989. The court PARTIALLY GRANTS plaintiff's motion to amend the findings of fact; however, such amendment does not change the outcome of this action. The court DEFERS ruling on Plaintiff's Motion for Review of Defendant's Bill of Costs. Plaintiff has twenty days from the date of this order in which to supplement his response to defendant's Bill of Costs.

So ORDERED.